IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| KENNETH ROACH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) 2:12-cv-289 |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Kenneth Roach, on July 25, 2012. For the reasons set forth below, the decision of the Commissioner is **REMANDED**.

Background

The plaintiff, Kenneth Roach, applied for Disability Insurance Benefits and Supplemental Security Income on July 13, 2009, alleging a disability onset date of July 13, 2009. (Tr. 166) His claim initially was denied on January 11, 2010, and again denied upon reconsideration. (Tr. 90, 104) Roach requested a hearing before an Administrative Law Judge ("ALJ"). A hearing before ALJ Karen Sayon was held on March 28, 2011, at which Roach and Vocational Expert Pamela Tucker testified. (Tr. 53-85)

On April 8, 2011, the ALJ issued a decision denying benefits. (Tr. 11-28) The ALJ's decision was upheld by the Appeals Council. (Tr. 1) Roach filed his complaint with this court on July 25, 2012. Roach has alleged that the ALJ erred by failing to accommodate his social functioning limitation and in finding that his mental condition was not of listing level severity.

Roach further has alleged that the ALJ's physical listing evaluation mandates reversal, the residual functional capacity lacks a supported basis, and that the ALJ failed to weigh properly the opinion of Roach's treating physician and to analyze his absenteeism appropriately.

At step one of the five-step sequential evaluation process for determining whether an individual is disabled, the ALJ determined that Roach had not engaged in substantial gainful activity since July 13, 2009, his alleged onset date. (Tr. 16) At step two, the ALJ determined that Roach had the following severe impairments: degenerative disc disease, gastritis, pancreatitis, gastroparesis, depressive disorder, antisocial personality disorder, substance addiction, and learning disorder. (Tr. 16).

At step three, the ALJ found that Roach did not satisfy listing 12.04 because he did not meet the "Paragraph B" criteria. (Tr. 17). The ALJ explained that to satisfy the Paragraph B criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 17). In activities of daily living, the ALJ determined that Roach had a mild restriction. (Tr. 17). Roach had no problems with personal care, prepared meals, left his home on a daily basis, used public transportation, and was able to go out alone. (Tr. 17).

The ALJ noted that on November 19, 2009, Dr. Gary Durak conducted a mental consultative examination of Roach at the request of the Bureau of Disability Determination. (Tr. 24) During this exam, Dr. Durak administered intelligence testing on Roach and determined that Roach had a performance IQ of 72, a verbal IQ of 69, a full scale IQ of 67, and a global assessment of functioning score of 50. (Tr. 24) Dr. Durak diagnosed Roach with major

2

depressive disorder, alcohol abuse, learning disabilities, mild mental retardation, and antisocial personality disorder. (Tr. 24)

With regard to social functioning, the ALJ determined that Roach had moderate difficulties. (Tr. 17). Roach reported that he did not engage in social activities and did not like interacting with others. (Tr. 17). B. Randall Horton, Psy.D. found that Roach had no significant limitations and only a few moderate limitations in social interaction and that Roach had moderate limitations regarding social functioning. (Tr. 17) Based on these findings, the ALJ found that Roach had moderate limitations. (Tr. 17)

The ALJ next found that Roach had moderate difficulties with concentration, persistence, or pace. (Tr. 17) Roach reported that he did not handle stress or changes in routine well but that he did not have difficulty following either written or verbal instructions. (Tr. 17). Dr. Horton found that Roach had no significant limitations and only a few moderate limitations in the categories of understanding and memory, sustained concentration and persistence, and adaptation. (Tr. 17) Based on Roach's written statements and Dr. Horton's determinations, the ALJ found that Roach's impairments placed moderate limitations upon his social functioning. (Tr. 17)

The ALJ found that Roach experienced no episodes of decompensation of extended duration. (Tr. 18) Because he did not have marked difficulties in two of the categories or marked difficulties in one category with episodes of decompensation, the ALJ concluded that Roach did not satisfy the Paragraph B criteria.

In determining Roach's RFC, the ALJ thoroughly discussed all of Roach's symptoms which could "reasonably be accepted as consistent with the objective medical evidence" and followed a two-step process: first determining whether there could be a medically acceptable

basis for his complaints, and second evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to determine if they limited his work ability. (Tr. 18-19)  The ALJ found that Roach had "a significant history of both alcohol and narcotic abuse" but that medical evidence supported a finding that Roach's substance abuse was in remission and did not prevent him from performing work on a sustained basis. (Tr. 23)  The ALJ determined that Roach had the Residual Functional Capacity (RFC) to do the following: "perform a range of sedentary work involving no exposure to heights or hazards; only simple instructions; only routine tasks; no fast paced production requirements; and no public interaction." (Tr. 26)

In her RFC analysis, the ALJ summarized Roach's medical history before addressing a third party function report regarding Roach's mental and physical capabilities that was completed by Roach's sister, Alice Mercer. (Tr. 24)  Mercer indicated that Roach had sleep disturbances as well as difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs, concentrating, completing tasks, and getting along with others. (Tr. 24)  However, Mercer stated that Roach lived alone, had no problems with personal care, did not need reminders regarding grooming or medications, was capable of preparing simple meals, did laundry, could go out alone, and was capable of using public transportation. (Tr. 24-25)  The ALJ indicated that she did not give significant weight to this statement based on its inconsistencies with the objective medical evidence and Roach's drug seeking behavior. (Tr. 25)

The ALJ stated that she did not give controlling weight to the opinions of Dr. Asrar Sheikh and nurse Debby Kark because they only saw Roach once, on the day before their letter was written, and thus had no longitudinal basis for their opinions. (Tr. 25)  The ALJ found that although the placement of a feeding tube is a somewhat extreme measure, the medical records indicated that Roach had not been compliant in its use, only used the hospital for treatment

without seeking follow-up care, and was dishonest with doctors. (Tr. 25) Significantly, the medical records did not indicate that Roach was unable to work and did not impose any significant work-related limitations on him, even with the feeding tube. (Tr. 25) Furthermore, the ALJ reasoned that even though Roach had many emergency room visits and hospitalizations, it did not appear that the visits were medically necessary, but rather were drug seeking attempts. (Tr. 25) As such, the ALJ found that the frequency of these unnecessary visits did not preclude Roach from working on a full-time, sustained basis. (Tr. 25)

Ultimately, the ALJ concluded that this was a credibility case and she did not find Roach's allegations credible. (Tr. 25) This finding was based on Roach's testimony that he had not been able to eat by mouth since his feeding tube was placed in March 2009, yet the medical records contained numerous admissions and indications of oral feeding in addition to a report of a nurse watching Roach force himself to throw up. (Tr. 25) Furthermore, medical reports repeatedly described Roach as drug seeking and manipulating, he frequently tested positive for cannabis and sometimes cocaine, and the doctors often felt his symptoms were due to acute narcotic withdrawal. (Tr. 25) The ALJ questioned the claim in Roach's brief that he was "self medicating" and indicated that the doctors suspected the drugs and alcohol were the actual cause of Roach's symptoms. (Tr. 25) The ALJ also noted that although Roach had lost weight, his weight loss could have been due to a variety of factors and that he was still at an appropriate weight. (Tr. 26)

At step four, the ALJ concluded that Roach was unable to perform any past relevant work. Finally, at step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy which Roach could perform, including electronics worker

(1,000 jobs in Indiana), assembler (450 jobs in Indiana), and grinding machine operator (500 jobs in Indiana). (Tr. 27)

## Discussion

The standard of review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.   **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852 (1972)(*quoting* *Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013)*; Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.   The claimant must show that he is unable " to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42**

**U.S.C. §423(d)(1)(A).** The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § § 404.1520, 416.920**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R.§§ 404.1520(b), 416.920(b).** If he is, the claimant is not disabled and the evaluation process is over. If he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. §§ 404.1520(c), 416.920(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1.** If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. **20 C.F.R. §§ 404.1520(e), 416.920(e).** However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1520(f), 416.920(f).**

  Roach raises six challenges to the ALJ's decision. First, he argues that the ALJ failed to accommodate his moderate social functioning limitation. Second, he argues that the ALJ erred in finding that his mental condition was not of listing level severity. Third, he alleges that the ALJ's physical listing evaluation mandates reversal. Fourth, he claims that the ALJ's residual

functional capacity lacks a supported basis. Fifth, he argues that the ALJ failed to weigh properly the opinion of his treating physician. Finally, Roach states that the ALJ failed to analyze properly his absenteeism.

Roach first contends that the ALJ did not evaluate his social functioning limitations as diagnosed by Dr. Horton correctly because she failed to include limitations on interacting with supervisors and coworkers when calculating the RFC and posing the hypothetical question to the vocational expert. The Commissioner argues that it was not necessary for the ALJ to impose those limitations because they were not assessed by Dr. Horton when making his final functional capacity assessment in Section III.

An RFC assessment must be "based on *all* of the relevant evidence in the case record," including medical source statements. **Social Security Ruling 96-8p.** The ALJ also is required to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." **Social Security Ruling 96-8p.** If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why that opinion was not adopted. **Social Security Ruling 96-8p.**

Here, the ALJ gave great weight to Dr. Horton's opinion but made no reference to the doctor's findings that Roach was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 531)  The Commissioner argues that Dr. Horton did not impose a restriction against contact with supervisors and co-workers.  However, in the Summary Conclusion section of the Mental Residual Functional Capacity Assessment, Dr. Horton did indicate that Roach was moderately limited in his interactions with supervisors and coworkers.  (TR 531). The ALJ did not articulate

a reason for omitting such restrictions. On remand, the ALJ should provide an explanation for this omission.

Second, Roach claims that the ALJ erred in finding that he did not have a mental condition of listing level severity. He argues that his IQ score combined with the ALJ's findings of his other severe impairments fulfilled the requirement of "a physical or other mental impairment imposing an additional and significant work-related limitation of function" in Listing 12.05(C).

For a claimant to show that he has met a listed impairment, he must show his impairment met each required criterion, and he bears the burden of proof in showing that his condition qualified. ***Maggard v. Apfel***, 167 F.3d 376, 380 (7th Cir. 1999). A condition that meets only some of the required medical criteria, "no matter how severely," will not qualify as meeting a listing. ***Sullivan v. Zebley***, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).

Section 12.00(A) of the social security regulations describes the structure of Listing §12.05. Specifically, the regulations state that if an "impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria," an impairment will successfully meet the listing. **20 C.F.R. § 401 pt. 404, subpt. P, app. 1 § 12.00(A)**. Listing § 12.05(C) provides in relevant part:

> **12.05** *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \* \* \*

> C. A valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. §401 pt. 404, subpt. P, app. 1 § 12.05(C). Thus, the structure of Listing § 12.05 indicates that a claimant must show *both* that he has met the listing's definition of mental retardation, *and* that he has met the required severity level by satisfying the requirements in either A, B, C, or D. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

In order to meet Listing § 12.05(C), there must first be evidence that "subaverage intellectual functioning" manifested prior to age twenty-two. If a claimant meets the definition of mental retardation, then the analysis shifts to whether the claimant's mental retardation is sufficiently severe to qualify as a disability, which is met when the requirements in either A, B, C, or D are proven. 20 C.F.R. §401 pt. 404, subpt. P, app. 1 § 12.05. If the individual is mentally retarded as defined by the regulations and has an IQ of less than 60, the claimant is considered disabled under Listing § 12.05 without further inquiry. 20 C.F.R. § 401 pt. 404, subpt. P, app. 1 § 12.05(B). However, an IQ over 60 is insufficient to establish disability under Listing § 12.05 alone, since people with low IQ's may be able to perform gainful employment. *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007). Thus, a claimant with an IQ between 60 and 70 must also show a "physical or other mental impairment" that creates an additional, and significant, limitation on his ability to work. 20 C.F.R. §401 pt. 404, subpt. P, app. 1 § 12.05(C). *See Maggard*, 167 F.3d at 380 (same).

The circuit courts presume that a person's IQ remains stable, absent evidence of a change in intellectual function. *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001). *See, e.g., Guzman v. Bowman*, 801 F.2d 273, 275 (7th Cir. 1986)(absent evidence to the contrary, IQ test taken

subsequently "should be assumed" to reflect IQ during the insured period); ***Branham v. Heckler***, 775 F.2d 1271, 1274 (4th Cir. 1985)(fact that no IQ test was taken earlier in life "does not preclude a finding of retardation").  However, a stable IQ, albeit low, does not necessarily equate to a showing of mental retardation as defined by Listing 12.05(C) before age twenty-two.  The Seventh Circuit has indicated that people with low IQs nevertheless may be able to perform work.  ***Novy***, 497 F.3d at 709.

Pursuant to regulations, the ALJ is allowed in determining qualification under Listing §12.05 to consider evidence concerning past work history in assessing "ability or inability to function in a work setting." 20 C.F.R. § 401 pt. 404, subpt. P, app. 1 § 12.00(A).  *See **Adkins v. Astrue***, 226 Fed.Appx 600, 605 (7th Cir. 2007)(while low IQ scores might be an indicator of retardation, other items, "including… employment history, must be considered and weighed;" claimant failed to prove deficits prior to age twenty-two even though school records were submitted showing only eight grade was completed, due in part to his long work history); ***Maggard***, 167 F.3d at 380 (no mental retardation, even though a low IQ score existed, in part due to claimant's ability to withstand the stress and pleasures associated with a day-to-day work activity").

The record indicates that upon a mental consultative examination of Roach by Dr. Durak at the request of the Bureau of Disability Determination, Roach was found to have a performance IQ of 72, a verbal IQ of 69, and a full scale IQ of 67. While these scores are within the range specified as one element of Listing 12.05(C), what is not clear is whether the "subaverage intellectual functioning" manifested prior to age 22.  Roach claims that the fact that he only completed the eighth grade and was in special education classes was evidence that it had. The Commissioner argues that Roach's semi-skilled work history indicates that he did not have the

11

necessary deficits in adaptive functioning to meet the diagnostic description of the listing. However, Roach testified that the longest he had held a job was six to eight months and that he had not obtained his GED because it was too difficult.

Furthermore, the record of Roach's exam by Dr. Durak reveals that Roach was diagnosed with mild mental retardation on Axis II of the Diagnostic Statistical Manual of Mental Disorders (DSM) classification. This condition is defined as "significantly sub average general intellectual functioning that is accompanied by significant limitations in adaptive functioning . . . . The onset must occur before age 18." **DSM-IV-TR at 41.** This diagnosis by the Agency expert supports Roach's claim that he satisfied the criteria to be considered mentally retarded under the listings because it evidenced significant sub average generally intellectual functioning with deficits in adaptive functioning prior to age 22.

The ALJ is not required to engage in a meaningful discussion of every piece of evidence, but she must consider the important evidence contradicting her opinion and explain her reason for discounting it. *Crenshaw v. Barnhart,* 2003 WL 360102 at *10 (N.D. Ill. Feb. 18, 2003). Here, the ALJ acknowledged the diagnosis by Dr. Durak yet noted that Roach did not satisfy the diagnostic description of Listing 12.05 with no further explanation. The ALJ must address the evidence that contradicted her opinion, in this case, Dr. Durak's diagnosis. Furthermore, there was no medical expert opinion in the record that contradicted Dr. Durak's diagnosis. The court cannot simply accept the ALJ's conclusion with no explanation of how she made that determination. The court must engage in an analysis of the evidence the ALJ relied on in her opinion in order to determine whether there was sufficient evidence to support her decision. Here, the ALJ has not provided an explanation, and the court will not speculate on the basis of her opinion. As such, Roach's claim must be remanded for further proceedings on this issue.

Third, Roach claims that the ALJ erred in her decision that his condition did not satisfy a Listing. He contends that although gastroparesis does not have its own Listing, it should be considered under Listing 5.06 for inflammatory bowel disease. Roach further alleges that the ALJ gave no indication as to whether she considered this Listing before concluding that Roach's condition did not satisfy a listing. In the ALJ's opinion, she found that Roach did not meet or medically equal a listed impairment, and specifically stated "In reaching this conclusion, I considered all of the listed impairments, but specifically Listings 1.04 and 5.01." (TR 17).

Listing 5.06 is defined as:

Inflammatory bowel disease (IBD) documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:

A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period;

OR

B. Two of the following despite continuing treatment as prescribed and occurring within the same consecutive 6-month period:

1. Anemia with hemoglobin of less than 10.0 g/dL, present on at least two evaluations at least 60 days apart; or

2. Serum albumin of 3.0 g/dL or less, present on at least two evaluations at least 60 days apart; or

3. Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or

4. Perineal disease with a draining abscess or fistula, with pain that is not completely controlled by prescribed narcotic medication, present on at least two evaluations 60 days apart; or

13

     5.     Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart; or

     6.     Need for supplemental daily enteral nutrition via a gastrostomy or daily parenteral nutrition via a central venous catheter.

*20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 5.06.*

Roach specifically asserts that he met criteria 5 and 6 and that his gastroparesis is medically equivalent to Listing 5.06. The ALJ's opinion viewed Roach's weight loss in a different light. During the time period from December 2009 to July 2010, Roach lost a total of 45 pounds. However, at his 2009 weight, Roach was considered obese according to BMI calculations. At Roach's July 2010 weight, which remained consistent through the March 2011 hearing, "he is right on the cusp of the high end of normal weight vs. the low end of overweight. Thus, even with weight loss (which could be due to a variety of factors), the claimant is still at an appropriate weight." (TR 26). The Listing criteria do not qualify the weight loss requirement with any conditions such as obesity or acceptable weight ranges, so the ALJ's reasoning on this issue is flawed.

The Commissioner contends that the ALJ relied on forms SSA-831 completed by Dr. Bond and Dr. Sands, the state agency reviewing physicians, in finding that Roach's medical conditions did not satisfy a Listing. Roach argues that these forms were completed prior to the placement of his feeding tube and his subsequent weight loss. Roach is correct that the Disability Determination and Transmittal forms were completed by Dr. Bond on January 11, 2010 and by Dr. Sands on March 16, 2010. (Tr. 86-89) Roach's feeding tube was placed on April 6, 2010 (Tr. 1399). Therefore, it is plausible that the circumstances surrounding his weight loss, and whether he met the requirements of a Listing, could have changed after Dr. Bond and Dr. Sands completed their reviews. As such, the ALJ should consider a more current medical opinion in

14

determining whether Roach's impairments met or medically equaled a listing.  On remand, the ALJ should consider whether Roach's gastroparesis or irritable bowel syndrome combined with his weight loss establish a medical equivalency under Listing 5.06.

Roach next argues that the ALJ's RFC determination was insufficient in that she failed to identify medical evidence that Roach was capable of a range of sedentary work because she did not rely on any physician opinion to support her finding. The Commissioner argues that the ALJ considered normal objective physical findings to support her assessment that Roach retained the capacity to work the minimal demands of sedentary exertion despite his impairments.

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what she must articulate in her written decision.  "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir.2008)(quoting *Clifford v. Apfel*, 227 F.3d 863 (7th Cir.2000)).

To support his contention that he is not capable of performing sedentary work, Roach has

pointed to the letter from Dr. Asrar Sheikh and nurse Debby Kark, dated October 7, 2010, which outlined Roach's daily care related to his feeding tubes and which specifically stated that his healthcare needs made it impossible for him to work. Despite this letter, the ALJ found that Roach had the residual functional capacity to perform sedentary work, excluding exposure to unprotected heights or hazards and involving only simple instructions, routine tasks, no fast paced production requirements, and no interaction with the public. (TR 18)  The ALJ went on to explain that she did not give controlling or great weight to Dr. Sheikh's opinion because he only saw Roach once, on the day before the letter was written. (TR 25)  The ALJ appears to have misconstrued two sentences in the letter: "Mr. Roach is a new patient in this practice. He was last seen in the office on October 6, 2010."  (TR 1094)  Although Dr. Sheikh considered Roach a new patient, Roach was not seen by Dr. Sheikh for the first time on the day before the letter. On the contrary, the record indicates that Dr. Sheikh treated Roach during his hospitalizations in August 2010 and that nurse practitioner Kark had treated Roach in Dr. Sheikh's office prior to the hospitalization. (AR 993) The record does not contain any contradicting physician opinion that indicated that Dr. Sheikh's opinion was inaccurate. The ALJ must resolve this discrepancy on remand.

Roach further claims that the ALJ failed to weigh properly the opinion of his treating physician, Dr. Sheikh, and that she used improper independent medical determinations in rejecting Dr. Sheikh's opinion. The Commissioner points to the ALJ's finding that Roach was not fully compliant in his use of the feeding tube and therefore questioned whether the limitations provided by Dr. Sheikh would be accurate.

A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically

16

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *See also* **Schmidt v. Astrue**, 496 F.3d 833, 842 (7th Cir. 2007); **Gudgell v. Barnhart**, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." **Clifford v. Apfel**, 227 F.3d 863, 870 (7th Cir. 2000) *(quoting* **Scivally v. Sullivan**, 966 F.2d 1070, 1076 (7th Cir. 1992)); *See also* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. 20 C.F.R. § 404.1527(c)(2); **Clifford**, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. **Schmidt**, 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see e.g.* **Latkowski v. Barnhart**, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); **Jacoby v. Barnhart**, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." **Hofslien v. Barnhart**, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

Here, the ALJ's order states that she did not give controlling weight to the opinions of

Dr. Sheikh and nurse Kark based on a lack of longitudinal basis for their opinions because they only saw Roach on one occasion, the day before their letter was written. The Commissioner argues that Roach was treated by Dr. Parvez and Dr. Favor rather than Dr. Sheikh during his August 2010 hospitalization. As explained above, although other doctors were consulted during Roach's hospital stay, treatment notes from Roach's August 20, 2010 hospital admission indicate both that Dr. Sheikh treated him during this hospitalization and that nurse practitioner Kark had treated Roach in Dr. Sheikh's office prior to the hospitalization. (Tr. 993-94)  Although the ALJ provided some discussion of the evidence that contradicted Dr. Sheikh's opinion that Roach was not capable of performing even sedentary work, including his non-compliance with the feeding tube and her opinion that the tube could be cleaned on normal breaks, it is not clear that the ALJ gave Dr. Sheik's opinion sufficient weight because she mistakenly believed that Dr. Sheik saw Roach on only one occasion.  Moreover, there is no medical evidence which contradicted Dr. Sheik's opinion.  In light of this oversight, the ALJ must clarify her decision on remand.

With regard to the Commissioner's argument that Dr. Sheik's limitations may not be accurate because Roach was not fully compliant with the feeding tube, SSR 82-59 is instructive:

> Identifying "Failure" as an Issue
>
> SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist:
>
> 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and
>
> 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and

18

> 3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and
>
> 4. The evidence of record discloses that there has been refusal to follow prescribed treatment.
>
> Where SSA makes a determination of "failure," a determination must also be made as to whether or not failure to follow prescribed treatment is justifiable

SSR 82-59

> Where the treating source has prescribed treatment clearly expected to restore ability to engage in any SGA (or gainful activity, as appropriate), but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed.
>
> *Development With the Claimant or Beneficiary* – The claimant or beneficiary should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.

SSR 82-59

In the present case, it is unclear whether Roach's compliance with the feeding tube was expected to restore capacity to engage in any substantially gainful activity. Dr. Sheikh indicated that Roach would require a feeding tube for the rest of his life, and the presence of the feeding tube appears to be the basis for Dr. Sheikh's conclusion that Roach cannot work. (TR 1094) However, even if compliance would restore Roach's ability to engage in a substantially gainful activity, there is no indication in the record that he ever was given an opportunity to express his reason(s) for not complying with the prescribed treatment. This issue should be addressed by the ALJ on remand.

Finally, Roach alleges that the ALJ failed to analyze properly his absenteeism when posing the hypothetical question to the vocational expert. The ALJ acknowledged that "the argument could be made that he could not sustain work on a full-time, sustained basis due to the frequency of these visits." (Tr. 25) The ALJ went on to explain why she believed this argument

19

was not valid in light of indications in the record that many of these visits were drug-seeking attempts rather than medically necessary treatments.  (Tr. 25)  Roach does not suggest that any medical opinion in the record specifically indicated that his absenteeism would be a factor which would preclude him from working. The ALJ further explained that "[o]verall, this is a credibility case, and the claimant's allegations are not credible."  (Tr. 25)  She then pointed to specific instances in the record where medical providers described Roach as drug seeking, manipulative, and inconsistent in his claims of pain during the emergency room visits he claims would be the cause of his ongoing absenteeism.  (Tr. 25)  Because she pointed to specific medical evidence to support her finding that Roach's absenteeism in the past was not medically necessary, the ALJ created "an accurate and logical bridge between the evidence and the result." ***Vincent v. Astrue***, 752 F. Supp. 2d 914, 925 (N.D. Ind. 2010).  As such, the ALJ's opinion as to this issue is affirmed.

On remand, the ALJ must take the additional evidence into consideration when assessing whether Roach met the Listing 12.05C criteria. The ALJ also should provide additional explanation for discounting any medical opinions.

Based on the foregoing the decision of the Commissioner is **REMANDED.**

ENTERED this 22nd day of November, 2013.

/s/ Andrew P. Rodovich
United States Magistrate Judge